UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GARRY L. LEWIS AND G. LEWIS-       CIVIL ACTION
LOUISIANA, LLC

VERSUS       NO: 18-1838

UNITED STATES OF AMERICA,       SECTION: "S" (1)
UNITED STATES ARMY CORPS OF
ENGINEERS, ET AL

### ORDER AND REASONS

IT IS HEREBY ORDERED that the **Motion for Partial Summary Judgment** (Rec. Doc. 33) filed by plaintiffs is **GRANTED**, and the Approved Jurisdictional Determination is set aside, and this matter is **REMANDED** to the agency for proceedings consistent with this order;

IT IS FURTHER ORDERED that the defendants' **Cross-Motion for Summary Judgment** (Rec. Doc. 36) is **DENIED**;

IT IS FURTHER ORDERED that defendants' **Motion to Strike Extra-Record Material** (Rec. Doc. 36) is **DENIED as moot**.

### BACKGROUND

This matter is an appeal from an Approved Jurisdictional Determination issued by the United States Army Corps of Engineers ("Corps") finding that certain of plaintiffs' property contains waters of the United States subject to the Clean Water Act ("CWA"). The property in question is composed of two separate tracts (the "east tract" and the "west tract") totaling approximately 40 acres located in Satsuma, Louisiana in Livingston Parish. It primarily consists

of two grass-covered, majority dry fields, with gravel logging and timber roads on two sides of each tract.[1] Plaintiffs and the prior owners of the land (Weyerhaeuser Lumber Company), for many years harvested and managed pine timber farming on these tracts, which are located approximately 1000 feet from Interstate 12. Water flows from the east tract via roadside drainage channels – roadside ditches – to an unnamed tributary, then to Colyell Creek, a relatively permanent waterway ("RPW"), and then on to Colyell Bay, a traditionally navigable waterway ("TNW"). The flow from the west tract travels a similar distance from the roadside ditches to Switch Cane Bayou and then to Colyell Creek before reaching the TNW, Colyell Bay. As determined by the Corps, Colyell Bay, the nearest TNW, is 10-15 river miles away.

In connection with plans to develop the land, in July 2015, plaintiffs (hereinafter, collectively "plaintiff" or "Lewis") sought a jurisdictional determination from the Corps determining whether the property was considered wetlands subject to the CWA. On August 26, 2016, the Corps issued an Approved Jurisdictional Determination ("AJD"), concluding that based on multiple field inspections of the property, one tract was 22% jurisdictional wetlands and the other was 38% percent jurisdictional wetlands.[2] Because the designation described the wetlands as a percentage, without specifying their actual locations, 78% and 62% dry portions of the land were effectively regulated.

Plaintiff administratively appealed on September 29, 2016, raising ten issues on appeal. On September 1, 2017, the Corps' review officer issued its administrative appeal decision,

---

[1]Administrative Record at AR0000172 ("AR172").

[2]AR164.

finding that two of the reasons assigned for the appeal had merit. Specifically, the review officer found that the District had "made errors in determining the size and location of adjacent wetlands in the cumulative analysis section, and incorrectly applied Corps policy guidance to document tributary and wetland characteristics for the significant nexus determination."[3] The review officer remanded the AJD to the district for reconsideration and documentation, and on November 3, 2017, the AJD was reissued. The reissued AJD revised the size and location of the wetlands, evaluated specific issues identified by the review officer, and included additional documentation. The 2017 basis forms reflect smaller drainage areas and smaller acreages of adjacent wetlands, but concluded that the same percentages of land constituted wetlands and were jurisdictional. On the east tract and a portion of west tract, the Corps identified 8.68 acres of wetlands that drain into 2,815 feet of man-made roadside drainage channels – ditches – that flow intermittently into an unnamed tributary, then to Colyell Creek, and then on to Colyell Bay, which is a traditional navigable waterway ("TNW"). On the west tract, the Corps identified 3.19 acres of wetlands that drain into 883 feet of roadside drainage channels, which flow into Switch Cane Bayou, then in to Colyell Creek, and then in to Colyell Bay.[4]

Plaintiff filed the instant suit, and the instant motion for summary judgment, arguing that under the Supreme Court's holding in Rapanos v. United States, 547 U.S. 715 (2006), the properties' connection to a traditional navigable waterway is too remote and too tenuous to support CWA jurisdiction. Plaintiff does not contest that his land contains wetlands, that there is

[3]AR144.

[4]AR10-11; AR20-21.

3

surface flow from the wetlands to roadside ditches and on to Colyell Bay, or that Colyell Bay is a TNW. Plaintiff does not dispute any factual evidence in the record. However, he argues that the record does not support a finding of a "significant nexus" between the wetlands on his property and a TNW. He also argues that under the CWA, the United States does not have jurisdiction over wetlands defined as a percentage of land which also includes uplands; that wetlands must be adjacent to "waters of the United States," and in this case, the land is adjacent to roadside ditches, which are excluded from "waters of the United States"; and that CWA jurisdiction does not extend to isolated wetlands, puddles, ponds, roadside ditches, which the wetlands at issue must be, because they can only be described as a percentage of the property.

The Corps filed a cross-motion for summary judgment, contending that this court's review of the agency's decision is limited to whether it is arbitrary and capricious and is adequately supported by the administrative record. The Corps further contends that the administrative record establishes that the Corps' finding of jurisdiction was not arbitrary and capricious, because it establishes the existence of a significant nexus between the wetlands and channels in this case to a TNW. The Corps also seeks summary judgment on plaintiff's constitutional claims brought under the Commerce Clause and the Tenth Amendment. Incorporated within its cross-motion, the Corps has also moved to strike numerous exhibits to plaintiffs' motion as being outside of the administrative record.[5]

_____

[5]While this case has been under advisement, on June 22, 2020, a new Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 FR 22250-01, 2020 WL 1914736, came into effect (the "New Rule"). The New Rule eliminates the case-specific "significant nexus" analysis in favor of a clearer definition of "tributary" that the agencies anticipate will be easier to implement. Because the agency's jurisdictional determination in this

## DISCUSSION

### I.  Legal Standards

#### A. Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Granting a motion for summary judgment is proper if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits filed in support of the motion demonstrate that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

#### B. Administrative Procedure Act

A jurisdictional determination by United States Army Corps of Engineers that property contains "waters of the United States" constitutes final agency action and is reviewable under the Administrative Procedure Act, 5 U.S.C. §702 ("APA"); U.S. Army Corps of Engineers v.

---

matter was premised on its finding that the relevant tributaries met the significant nexus test, the court ordered additional briefing on the impact of the New Rule and whether, given the abolition of the significant nexus test, the Corps would be willing to set aside its AJD.

The Corps responded that the New Rule does not invalidate this AJD, which remains valid until its expiration date, citing the New Rule, 85 FR 22250-01, 2020 WL 1914736, *22331-22332. It further contends that even if it were to apply the New Rule, the current administrative record is insufficient for the Corps to apply the revised regulatory definitions in the new rule.

Plaintiff acknowledged that the New Rule does not render moot the present case, but contends that his land is not jurisdictional under the CWA and categorically excluded from coverage under the New Rule. Plaintiff also filed a Motion for Declaratory Judgment that is treated in a separate Order & Reasons.

Hawkes Co., 136 S. Ct. 1807 (2016).[6]  Under the APA, any "person adversely affected or aggrieved by agency action" is entitled to judicial review of "agency action made reviewable by statute and final agency action for which there is no other adequate remedy[.]" 5 U.S.C. §§ 702, 704. A reviewing court must "set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law [or] contrary to constitutional right, power, privilege, or immunity[.]" 5 U.S.C. § 706(2).

This standard is highly deferential and courts must afford the agency's decision a presumption of regularity. Hayward v. U.S. Dep't of Labor, 536 F.3d 376, 379–80 (5th Cir. 2008)(citations omitted). Reviewing courts are limited to whether the agency "articulated a rational connection between the facts found and the decision made," and "it is well-settled that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." Id. (internal citations and quotations omitted). While a reviewing court conducts a " 'searching and careful review ' " of the administrative record to determine whether the agency acted arbitrarily or capriciously, it may not substitute its judgment for the agency's. Id. (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415–416 (1971). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

---

[6] The Corps specifies whether particular property contains "waters of the United States" by issuing "jurisdictional determinations" ("JD"s) on a case-by-case basis. 33 C.F.R. § 331.2. Approved JDs definitively "stat[e] the presence or absence" of waters of the United States. Id. An approved JD is binding for five years. 33 C.F.R.  pt. 331, App. C.

### C. Waters of the United States under the Clean Water Act

The Clean Water Act provides for jurisdiction over waters deemed "waters of the United States." 33 U.S.C. §1362. However, "[t]he outer limit of the phrase 'waters of the United States' remains fuzzy." Gulf Restoration Network v. McCarthy, 783 F.3d 227, 230 n. 5 (5th Cir. 2015) (citing Rapanos v. United States, 547 U.S. 715, 733–34 (Kennedy, J., concurring in the judgment). As in this case, the Rapanos court addressed the question of the Corps' jurisdiction over wetlands adjacent to "ditches or man-made drains that eventually empty into traditional navigable waters." Rapanos, 547 U.S. at 729. Unfortunately for the lower courts, the Rapanos court did not adopt a single bright-line rule, but handed down a 4-1-4 plurality opinion providing two tests for determining whether a water body is a water of the United States.

Justice Scalia's plurality opinion adopted an adjacency test, concluding that the phrase "waters of the United States" includes only "relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] ... oceans, rivers, [and] lakes.' " Id. at 739. Thus, for federal regulatory jurisdiction purposes, "*only* those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the Act." Id. at 742 (emphasis in original).

Justice Kennedy filed a concurring opinion, which advanced a different test, concluding that the Corps' jurisdiction extends to wetlands when there is "a significant nexus between the wetlands in question and navigable waters in the traditional sense." Id. at 779 (Kennedy, J.,

concurring). Wetlands "possess the requisite nexus" if "either alone or in combination with similarly situated lands in the region, [they] significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.' " Id. at 780. Where the wetlands in question are "adjacent to navigable-in-fact waters, [the government] may rely on adjacency to establish its jurisdiction." Id. at 782. Where wetlands are adjacent to non-navigable tributaries, "[a]bsent more specific regulations ... [the government] must establish a significant nexus on a case-by-case basis." Id. However, when the wetlands effects on water quality are speculative or insubstantial, they lack the requisite significant nexus and are not subject to CWA jurisdiction. Id. at 782.

In a dissent authored by Justice Stevens, four dissenting justices opined that adjacency to either navigable in fact waters or their tributaries would satisfy the significant nexus requirement, and specifically stated that "all four Justices who have joined this opinion would uphold the Corps' jurisdiction ... in all other cases in which either the plurality's or Justice Kennedy's test is satisfied...." Id. at 810 (Stevens, J. dissenting).

Following Rapanos, the circuits have split on which approach is correct.[7] The Fifth

---

[7] The First (United States v. Johnson, 467 F.3d 56, 64–66 (1st Cir. 2006)), Third (United States v. Donovan, 661 F.3d 174, 176, 182 (3d Cir. 2011)), and Eighth Circuits (United States v. Bailey, 571 F.3d 791, 799 (8th Cir. 2009)) have followed the dissent and held that jurisdiction is established under either the plurality's adjacency test or Justice Kennedy's significant nexus test. The Fourth (Precon Dev. Corp., Inc. v. U.S. Army Corps of Eng'rs, 633 F.3d 278, 288 (4th Cir. 2011)) and Ninth Circuits (N. Cal River Watch v. Wilcox, 633 F.3d 766, 781 (9th Cir. 2011)) have applied Justice Kennedy's test without deciding whether the plurality's test could provide an alternate ground for establishing CWA jurisdiction. Applying Marks v. United States, 430 U.S. 188 (1977), the Seventh (United States v. Gerke Excavating, Inc., 464 F.3d 723 (7th Cir. 2006)) and Eleventh Circuits (United States v. Robison, 505 F.3d 1208 (11th Cir. 2007)) have concluded that Justice Kennedy's test is the narrowest and thus should control.

Circuit has not explicitly endorsed an approach. In United States v. Lucas, 516 F.3d 316, 327 (5th Cir. 2008), the Fifth Circuit upheld CWA jurisdiction noting that the facts and evidence satisfied both tests, without indicating if both were required to be met. In United States v. Lipar, 665 F. App'x 322,  (5th Cir. 2016), the Fifth Circuit reviewed a case in which the district court had found no CWA jurisdiction because the wetlands at issue had met neither test. In reversing a summary judgment against the United States, the Fifth Circuit did not adopt a specific test, noting that the district court "purported to reject the government's position under either the Rapanos plurality or concurring opinions, which would have been a legally permissible approach...." Id. at 325. This ambiguous language, in an unpublished opinion, seems to suggest that failing either test would support a finding of no jurisdiction, which implies that both must be met. However, the statement has also been interpreted in other circuits to mean that satisfying either test establishes jurisdiction. See United States v. Robertson, 875 F.3d 1281, 1290 (9th Cir. 2017), cert. granted, judgment vacated on other grounds 139 S. Ct. 1543 (2019).

In this case, the court finds that neither the adjacency nor the significant nexus test is met. Accordingly, it need not make a finding explicitly adopting either Rapanos' plurality, Kennedy, or dissenting approach.[8]

## II. Application to Facts of Case

### A. The Corps cannot satisfy the adjacency test for CWA jurisdiction.

The Corps has acknowledged that the land in question does not meet the adjacency

---

[8]As discussed supra in note, 5, on June 22, 2020, the new Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 FR 22250-01, 2020 WL 1914736 went into effect. It eliminates the significant nexus inquiry in AJD applications made after that date.

requirement set forth under the Scalia test. Accordingly, it provides no basis for CWA jurisdiction.

### B. The Corps has failed to satisfy the significant nexus test for CWA jurisdiction.

#### 1. The significance nexus test and the Corps' "Rapanos Guidance" interpreting it.

As noted above, wetlands possess a significant nexus to navigable waters if the wetlands, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" Rapanos, 547 U.S. at 759 (Kennedy, J., concurring)(citing Solid Waste Agency of Northern Cook Cty. v. Army Corps of Engineers, 531 U.S. 159, 167 (2001). In contrast, if the "wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" 547 U.S. at 781 (Kennedy, J., concurring). The determination whether the significant nexus test is met is made case-by-case. Id. at 782.

The significant nexus test is a "flexible ecological inquiry." Precon Development Corp., Inc. v. Army Corps of Engineers, 633 F.3d 278, 294 (4th Cir. 2011). However, while "the significant nexus test does not require laboratory tests or any particular quantitative measurements in order to establish significance.... in announcing this test, [Justice Kennedy] clearly intended for some evidence of both a nexus and its significance to be presented. Otherwise, it would be impossible to engage meaningfully in an examination of whether a [water] had "significant" effects or merely "speculative or insubstantial" effects on navigable waters." Precon, 633 F.3d at 294 (quoting Rapanos, 547 U.S. at 780).

Following <u>Rapanos</u>, the Corps and EPA issued a <u>Rapanos</u> Guidance ("RG") document. RG, p. 3.[9] Under the <u>Rapanos</u> Guidance, in conducting the significant nexus analysis, the Corps assesses the flow characteristics and functions of the tributary itself, as well as the functions performed by any adjacent wetlands, to determine if they significantly affect the chemical, physical, and biological integrity of downstream traditional navigable waters. RG, p. 8.  The Corps must also consider hydrologic factors including volume, duration, and frequency of flow. <u>Id.</u>  Ecologic factors which the Corps must consider include the potential of tributaries to carry pollutants and flood waters to traditional navigable waters, provision of aquatic habitat that supports a traditional navigable water, the potential of the wetlands to trap and filter pollutants or store flood waters, and the maintenance of water quality in traditional navigable waters. <u>Id.</u> Ditches (including roadside ditches) excavated wholly in and draining only uplands and that do not carry a relatively permanent flow of water, are generally not jurisdictional. <u>Id.</u>

"[A]fter assessing the flow characteristics and functions," the Corps must evaluate whether these factors "are likely to have an effect that is more than speculative or insubstantial on the chemical, physical, and biological integrity of a traditional navigable water." RG, p. 11. "As the distance from the tributary to the navigable water increases, it will become increasingly important to document whether the tributary and its adjacent wetlands have a significant nexus rather than a speculative or insubstantial nexus with a traditional navigable water." <u>Id.</u>

---

[9] The court takes judicial notice of the Rapanos Guidance, which is provided at: <u>https://www.usace.army.mil/Missions/</u>Civil-Works/Regulatory-Program-and-Permits/ Related-Resources/CWA-Guidance. See FED R. EVID. 201(b)(2).

### 2. The significant nexus analysis in the present case.

In this case, the significant nexus determination contained in the basis forms is relatively

brief and therefore for ease of reference is restated in its entirety[10] below:

> This significant nexus determination applies to wetlands adjacent to onsite
> non-RPWs and similarly situated wetlands. The onsite wetland is part of a larger
> wetland/upland complex transected by onsite roadside drainage channels (non-
> RPW). Flow occurs from the onsite wetland to onsite non-RPWs then via culvert
> into an offsite unnamed tributary (along the southern boundary) to Colyell Creek,
> an RPW. Colyell Creek flows to Colyell Bay, a TNW. The onsite non-RPW has
> been manipulated (maintained), thereby increasing flow rates and enhancing the
> ability of the tributary system to carry sediments and particulates to Colyell Creek
> as evidenced by observation of sediment deposits and drift lines containing
> organic matter within the channel and at the point where the on-site non-RPW
> enters the offsite unnamed tributary via culvert. Flow rates from the wetland to
> the onsite non-RPW have been increased by excavation work in the onsite
> wetland and onsite non-RPW. This work has diminished the wetlands ability to
> provide stormwater storage and groundwater recharge. The "improvements" result
> in reduced resident time of water in the channel and the ability of natural
> processes to improve the quality of the runoff. Sediment run off will also be
> increased for a period of time following manipulation due to soil disturbance and
> removal of soil binding vegetation. The wetlands adjacent to the non-RPWs
> provide storm water storage and attenuate fluctuations in flows following storm
> events. *Evidence of* stormwater storage was observed during site visits by
> documenting saturated soils and standing water within the wetland. This function
> positively affects the integrity of the onsite non-RPWs and downstream tributary
> system. This function is diminished on the subject property by the excavated
> swales constructed within the onsite wetlands to remove surface water. During
> low flow periods, sediments and other pollutants *will be* trapped and assimilated
> by the non-RPWs and wetlands. Following significant precipitation events, a
> portion of the pollutants will go into solution and flow from the wetland to the
> onsite non-RPW into the downstream tributary system. *Evidence of* flow from
> onsite wetlands was observed as drift deposits containing organic matter.
> Pollutants in excess of the assimilative capacity of the non-RPWs and associated

---

[10] As acknowledged by the Corps, the significant nexus analysis for the east tract mirrors
that for the west tract in all important respects, thus only the analysis for the east tract is
excerpted here. The significant nexus analysis for the west tract is found in Basis Form B and is
located in the administrative record at AR14.

wetlands *will eventually reach* Colyell Creek and Colyell Bay. The contributions
of wetlands and upstream waters to the physical, chemical, and biological
integrity of downstream waters is well documented in the literature. The non-
RPWs and associated wetlands in the subject watershed *can impact* the TNW
adversely or beneficially. Thus, the nexus determination has two components. *To
the extent that* the wetland, similarly situated wetlands, and the non-RPWs can
withhold sediments, pollutants, carbon, and stormwater, this system collectively
has a significant positive effect on the integrity of the TNW. Where portions of
the system have been disturbed or removed, including channelization and clearing
for development, the tributary and associated wetlands will have less beneficial
effects on the TNW due to reduced functionality. Similarly, events that exceed the
assimilative capacity of the system *will have marked negative and/or positive
effects on the downstream system*. Thus, the subject wetlands, non-RPWs and
similarly situated wetlands have a significant nexus with the TNW. Additional
remarks can be found below in Section IV B.[11] (Emphasis added.)

### a. Hydrologic factors: volume, duration, and frequency of flow

Initially, the court observes that despite the fact that the Corps' analysis was based on seven

site visits between the two tracts, while "evidence of flow" was apparently observed, nowhere in

the significant nexus analysis does it explicitly state that the Corps' investigators actually

observed any flow in the non-RPW ditches or the neighboring wetlands. To the contrary, as the

emphasized portions reflect, the Corps observed evidence of flow from which it made inferences

regarding the flow and its impacts. And while the administrative appeal decision states that "the

District observed multiple flow events in each tributary where flowing surface water was within

the discrete and confined channels" [of the ditches],[12] and that water movement was observed on

---

[11]Section IV(B) notes the percentages determined to be wetlands, that the flow has been
manipulated by ditches and logging roads, that wetlands provide habitat diversity, that Colyell,
Creek, Colyell Bay and tributaries are listed as impaired waters, that removing trees decreases
water quality, and cites several scholarly articles on wetlands.

[12]AR140.

and off the project site following during the October 28, 2015 site visit,[13] the court has reviewed the August 2016 Basis Forms reviewed by the review officer and the October 28, 2015 Data Forms completed by the Corps, and cannot independently corroborate this in its review of the record.

Rather, with respect to flow, the August 2016 Basis Forms reviewed by the review officer reflect that the land experiences "[o]verland sheetflow . . .  following precipitation events during periods of soil saturation or when rainfall rate exceeds absorption rate of soil."[14] In the revised 2017 AJD, following the review officer's directive to provide more analysis, the Corps adds that "Evidence of surface flow was observed by the presence of drift lines within onsite wetlands."[15] All of this suggests the Corps observed only evidence of flow, not actual flow.

Moreover, a review of the Wetland Determination Data Forms for the October 28, 2015 visit,[16] made after heavy recent rainfall,[17] reflect that no locations observed had any surface water, and only two had saturation. Further, the Corps' Memorandum for Record of the appeal meeting reflects that at the meeting, "the District stated they observed *field indicators* that show sediment is both staying on the site and being transported to the tributary system."[18]

---

[13]AR148.

[14]AR521.

[15]AR18.

[16]AR250-262.

[17]AR260.

[18]AR498 (emphasis added).

The 2017 AJD Basis Forms reflect that flow in the ditches is "intermittent but not seasonal," and estimates that there are at least 20 flow events per year, and that "the channel flows following precip[itation] events and during times of high water table. *Portions of the channel network held ponded water on each site visit.*"[19] Again, this indicates that the Corps observed ponded, not flowing water, on its visits. The Basis Form also notes that its finding of an ordinary high water mark was based in part on "multiple observed *or predicted* flow events,"[4] further supporting the inference that flow was not necessarily observed. Additionally, the court has reviewed every photograph included in the administrative record, and as noted by plaintiff, not a single photograph reflects any flow (or for that matter, standing water) on the subject property.[5] Thus, based on the record before it, the court must operate on the premise that the Corps never actually observed flow in the ditches at the site.[6] While this does not necessarily mean that actual flow, perhaps even substantial, does not occur at the site, it does mean that more than mere observation of the site on occasions when no flow was present is required to establish substantial flow for purposes of the significant nexus inquiry.

Addressing the predicted flow, the Corps' significant nexus analysis recites that the subject wetlands, allegedly abutting the ditches, "provide storm water storage and attenuate fluctuations

---

[19]AR06 (emphasis added).

[4]AR06.

[5]See AR154; AR163; AR172; AR180; AR183; AR391; AR392; AR396; AR397; AR398; AR403; AR416-426.

[6] Even if the Corps had observed some flow, that would not materially alter the court's analysis.

in flows *following storm events.*" It further states that the tracts in question are located on a 500-year flood plain.[7] This raises the question: considering that flow occurs after precipitation events, there is a .2% chance of flooding in any given year, and no flow was actually observed by the Corps, how did the Corps determine that any flow, and its impact, was substantial?

Further, in this case, the TNW is located ten to fifteen miles from the site. "As the distance from the tributary to the navigable water increases, it [is] increasingly important to document whether the tributary and its adjacent wetlands have a significant nexus rather than a speculative or insubstantial nexus with a traditional navigable water." RG, p. 11. That documentation is lacking here. As in <u>Precon</u>, which similarly held that the Corps had failed to establish a significant nexus, "the Corps' administrative record does not appear to contain *any* measurements of actual *flow.*" <u>Precon</u>, 633 F.3d at 294 (emphasis in original). Rather, the significant nexus analysis in this case describes the flow pattern from the wetlands to the ditches, and on to the TNW, and how it is and has been affected by maintaining the ditches. Specifically, it indicates that the wetlands provide storm water storage that has been reduced by modifying the adjacent ditches so that water flows more quickly through them. The analysis has little to say on the actual downstream effects of any flow, and what it does say is notably lacking in specifics. It reflects that after a storm, the subject wetlands retain water (presumably in puddles), with the result that less water flows through the adjacent ditches to the TNW. When the ditches fill, water, which may include pollutants, flows through them, eventually reaching Colyell Creek (assuming it occurs at a point in time when Colyell Creek, an RPW, is actually flowing), and,

_____

[7]AR08, AR18.

after a journey of fifteen miles, in to Colyell Bay. Then, *to the extent that* the wetlands and ditches withhold sediments, pollutants, carbon, and stormwater, this system collectively has a significant positive effect on the integrity of the TNW, except in those cases when their assimilative capacity is exceeded, in which case they will have marked negative and/or positive effects on the downstream system.

The review officer's analysis on the question of flow does not point to record evidence nor provide the required finding that the nexus is substantial. It relies on purported but uncorroborated observations of actual flow to support its conclusion that "[b]ased on these observations, the District concluded that each tributary and their adjacent wetlands store water, contribute to groundwater recharge, and attenuate flow during storm events that would otherwise reach the TNW."[8] While that may be true, it does not point to record evidence nor assert that the described effects are substantial.

The court's foregoing critique is not an independent determination that the flow and its effects *are not* substantial – the court's role is not to resolve fact issues on the administrative record. And clearly, there is evidence that some flow occurs: the observed sediment deposits and drift lines containing organic matter within the channel and at the point where the on-site non-RPW enters the offsite unnamed tributary via culvert. Rather, the court finds that the analysis provided does not adequately support the required finding: that the flow is substantial and that it has a significant downstream impact on the TNW.

---

[8] AR140.

### b. Ecologic factors - pollutants, flood water storage, downstream water quality

The Corps' significant nexus analysis is also wanting in its discussion of the ecologic effects on downstream water quality. The Basis Form notes that "Colyell Creek, including [its] tributaries is on EPA's Impaired Waters List. Causes of impairment are fecal coliform, Probable source is septic systems and similar decentralized systems."[9] The Basis Form identifies the following pollutants specific to the ditches in this case: sediment, organic matter, fecal coliform, and mercury from atmospheric and unknown sources."[10] The Basis Form describes the wetlands' chemical characteristics as "[r]elatively clear, some organic particulates and dissolved nutrients (naturally occurring carbon, nitrogen, etc.), and identifies sediments and organic matter as specific pollutants.[11]

The Corps' significant nexus analysis states that "[f]ollowing significant precipitation events, a portion of the pollutants will go into solution and flow from the wetland to the onsite non-RPW into the downstream tributary system." It also states that "[p]ollutants in excess of the assimilative capacity of the non-RPWs and associated wetlands will eventually reach Colyell Creek and Colyell Bay." And finally, it concludes that "[t]o the extent that the wetland, similarly situated wetlands, and the non-RPWs can withhold sediments, pollutants, carbon, and stormwater, this system collectively has a significant positive effect on the integrity of the TNW."

---

[9] AR07.

[10] AR07.

[11] AR18.

18

Again, because the tract lies within the 500-year flood plain, and a portion of the pollutants go into solution and flow downstream only following "*significant* precipitation events," the question arises whether the significant events occur often enough to have a substantial impact. Likewise, even acknowledging that "*a portion* of the pollutants" flow from the wetland into the ditch and then downstream – that does not resolve the question whether the portion is large enough to have substantial downstream effects on the TNW. The court does not doubt that whatever pollutants are present in the wetlands and that flow into the ditches may well ultimately make their way to Colyell Bay. All water eventually makes its way to the sea. Some molecules might even make it to the Gulf of Mexico. However, the question here is how much? And is it substantial? Those questions are simply not satisfactorily resolved in the record before the court.

The analysis of this issue included in the administrative appeal decision is likewise not helpful. The decision notes with respect to pollutant trapping that

> the District identified the flow within each tributary was "relatively clear to cloudy depending on sediment load and recent disturbance in the drainage area" and identified the tributaries were included in the EPA's Water Quality Assessment Report that found water quality impairment due to dissolved oxygen, fecal coliform, mercury, and nutrients that include nitrate/nitrite an phosphorous. The District identified sediment as a specific pollutant in each tributary and their adjacent wetlands on the site. Based on these observations and information, the District determined each tributary and their adjacent wetlands retain and assimilate sediment, particulates, and nutrients that would otherwise diminish water quality in the downstream TNW.

The decision goes on to note that the AJD form references scientific literature that support the Corps' observations, quoting the following generic statement: "Overall, it appears from the research that the presence of wetlands in a watershed will reduce or slow downstream

flooding."[12]

This discussion of the ecologic factors merely informs the reader that some pollutants, in the form of sediment, are present in the ditches and wetlands, are trapped by the ditches and wetlands, and otherwise would flow downstream. How much and how harmful that downstream flow to the TNW would be is not asserted, much less supported. The generalized, conclusory language from journal articles that "[o]verall, it appears from the research that the presence of wetlands in a watershed will reduce or slow downstream flooding," is not probative on the point of whether in this particular case the wetlands are having a substantial effect. Thus, the record does not establish any *substantial* effect of these wetlands and ditches on Colyell Bay.

Moreover, the EPA Waterbody Quality Assessment Report ("QA Report") does not shed light on the question. First, it is not an assessment of the ditches and wetlands at issue, but of Colyell Creek and its tributaries and Colyell Bay. While that would be helpful if it was used to measure before and after loads of pollutants flowing from the wetlands through the ditches, it has not been so utilized. The QA Report merely reflects the causes of impairment of the reported water bodies (not the water bodies the Corps seeks to regulate in this case), and states that, at the time of its compilation, the State of Louisiana had not yet developed Total Maximum Daily Load ("TMDL") specifications.[13] It provides no basis to infer what amount of pollutants may have flowed into Colyell Bay from the ditches and wetlands in this case, much less if the amount is

---

[12] AR141.

[13] A TMDL is the calculation of the maximum amount of a pollutant allowed to enter a waterbody so that the waterbody will meet and continue to meet water quality standards for that particular pollutant. https://www.epa.gov/tmdl/overview-total-maximum-daily-loads-tmdls#1.

substantial.

### c. The Corps' ground proofing argument is not persuasive

In defense of the lack of specificity in this case, the Corps stated at the appeal conference that "it does not have a budget for research level data collection or ground proofing the significant nexus determination."[14] While that may be the case, the Corps' budgetary constraints cannot excuse it from following Supreme Court precedent requiring a significant nexus between the land in question and a TNW. Under that precedent, that nexus cannot be established without demonstrating substantial effects on the TNW. And, as the Appeal Meeting notes appear to reflect, the Corps acknowledged that without some ground proofing, substantial effects cannot be demonstrated.[15] As plaintiff suggested, a single cellphone photograph showing a substantial flow from the property would have been instructive. Additionally, the Corps has acknowledged that the AJD rests in part on "estimates based on available information." This also suggests the analysis was not specific to this case.

The significant nexus analyses for both tracts in this case are devoid of references to any specific data that would establish that downstream effects are significant or marked. While the wetlands might have an effect *to the extent that* they withhold sediments, etc., the analysis provided does not enlighten as to what extent they do so, leaving us to speculate, and if so, whether this flow occurs often enough for it to be significant. Rather, the significant nexus

---

[14] AR498.

[15] See AR508, noting that in response to plaintiff's statement at the appeal meeting that the Corps' conclusions were speculative and insubstantial, Corps' employee Mr. Nethery acknowledged that they were "insubstantial without groundproofing."

analysis in this case reflects that based on site visits, the Corps determined while the tracts are generally dry, after a rain, puddles form in the tracts,[16] flow into the ditches, and through the ditches, and, ten to fifteen miles later, eventually reach the TNW, Colyell Bay. It does not establish that the flow is voluminous enough, and significant enough, to have a *substantial* effect downstream. While it notes that certain pollutants are present in the predicted flow, again, it does not assert that their effects are substantial.  Moreover, the rest of the basis forms do not answer this question.

Accordingly, the Corps' finding that a significant nexus exists between the subject wetlands adjacent to man-made ditches, flowing at unknown rates toward Colyell Bay, a TNW ten to fifteen miles away, is not adequately supported by the record. The Corps' has thus not adequately "articulated a rational connection between the facts found and the decision made," Hayward, 536 F.3d at 379–80 (5th Cir. 2008), rending its determination in this case is arbitrary and capricious.

### C. Remand is the appropriate remedy in this case.

Lewis has prayed that the court enter judgment finding that no federal jurisdiction exists over the subject land. However, in cases such as this in which a court determines that agency action was arbitrary or capricious, the APA permits the court to "hold unlawful and set aside" that action. 5 U.S.C. § 706(2). "If the agency decision is not sustainable on the basis of the administrative record, then 'the matter should be *remanded* to [the agency] for further consideration.' " Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897, 905 (5th Cir. 1983)(emphasis in original) (citing Camp v. Pitts, 411 U.S. 138, 143; accord Vermont Yankee

---

[16]Indeed, the record reflects that the puddles form in former tree sites.

Nuclear Power Corp. v. National Resources Defense Council, Inc., 435 U.S. 519, 549 (1978)).

Thus, while the court is sympathetic to plaintiff's desire for finality, considering that he began

the formal process seeking a non-jurisdictional finding almost five years ago, and an informal

one before that, the appropriate remedy is remand.

### III.   Motion for Summary Judgment on Constitutional Claims

Lewis' complaint also alleges that the Corps' assertion of CWA jurisdiction regulated his

land unconstitutionally in violation of the Commerce Clause and the 10th Amendment. The Corps

has moved for summary judgment on both claims, contending that application of the CWA to the

wetlands on Lewis's property falls comfortably within constitutional bounds.

In the complaint, Lewis essentially alleges that in regulating land that does not meet the

adjacency test formulated by Justice Scalia in Rapanos, the Corps has exceeded the authority of

the commerce clause, which provides the authority for the CWA. Cmplt. ¶ 27. In contrast, the

Corps argues that where a significant nexus is present, no constitutional issues are implicated.

As the foregoing analysis demonstrates, the court finds that the Corps has not established a

significant nexus between the wetlands and ditches on or neighboring the subject property.

Accordingly, the premise for the Corps' argument is not applicable. The Corps' motion for

summary judgment on the constitutional claims is therefore denied.

### IV.   Motion to Strike Extra Record Material

Plaintiff's motion for summary judgment included numerous items outside the

administrative record. Incorporated within the Corps' cross-motion for summary judgment was a

motion to strike this extra-record material. Because the court has not relied on any items outside

the administrative record, with the exception of the Rapanos Guidance of which it took judicial notice and to which the Corps did not object, the motion is denied as moot.

## CONCLUSION

**IT IS HEREBY ORDERED** that the **Motion for Partial Summary Judgment** (Rec. Doc. 33) filed by plaintiffs is **GRANTED**, and the Approved Jurisdictional Determination is set aside, and this matter is **REMANDED** to the agency for proceedings consistent with this order;

**IT IS FURTHER ORDERED** that the defendants' **Cross-Motion for Summary Judgment** (Rec. Doc. 36) is **DENIED**;

**IT IS FURTHER ORDERED** that defendants' **Motion to Strike Extra-Record Material** (Rec. Doc. 36) is **GRANTED**.

New Orleans, Louisiana, this ___18th___ day of August, 2020.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**

24